UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| ROBERT CHINN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 12-88-GFVT |
| | ) | |
| v. | ) | |
| | ) | |
| AT&T UMBRELLA BENEFIT PLAN | ) | **MEMORANDUM OPINION** |
| NO.1, | ) | **&** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the parties' cross-motions for judgment, which the

Court construes as a motion to overturn the administrative decision that denied Plaintiff Robert

Chinn's claim for long-term disability benefits.  This matter has been fully briefed [R. 13; R. 14],

and for the reasons set forth below, the Court will uphold the decision.

**I**

This case presents issues for the Court to consider under the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq*.  As such, this Court

exercises federal question subject matter jurisdiction.  *See Pilot Life Ins. Co. v. Dedeaux*, 481

U.S. 41, 52-56 (1987).  BellSouth Telecommunications, Inc., which does business under the

AT&T name, provides both short-term and long-term disability benefits to its employees under

an ERISA plan.  [R. 13, Ex. A at 3.]  The Plaintiff, Robert Chinn, was an employee of AT&T for

36 years, most recently as a Manager of Construction and Engineering.  [AR[1] 2.]  As a full-time

---

[1] To maintain consistency with the briefs, citations will be to the page numbers from the Administrative Record
("AR") when available.

employee, Chinn was covered by AT&T's basic long-term disability ("LTD") plan which pays 50% of an employee's base earnings if they meet the Plan's definition of disabled." [R. 12 at 1.] Chinn later purchased an additional 20% of coverage that would pay 70% of his base earnings upon his becoming disabled. [*Id.*]

AT&T employees could receive short-term disability benefits for a maximum period of 26 weeks, after which they could apply for long-term disability benefits. As long as the employee meets the long-term "total disability" standard outlined in the Plan, qualified employees can receive benefits up to age 65. [R. 13 at 2.] The Plan at issue in this case defines "disability" as follows:

> You are considered Totally Disabled for purposes of Company-Paid Long-Term Disability Benefits under this Program when you have an Illness or Injury that prevents you from engaging in any employment for which you are qualified or may reasonably become qualified based on education, training or experience. You will be considered Totally Disabled for a long-term disability if you are incapable of performing the requirements of a job other than one for which the rate of pay is less than 50 percent of your Pay (prior to any offsets) at the time your long-term disability started.

[R. 13, Ex. A at 22.] To be eligible under the Plan, employees also had to be a management employee or a bargained employee, and have completed a six-month term of employment. Mr. Chinn clearly met these requirements, and the primary point of contention between the parties is whether Chinn met the definition of total disability as defined by the Plan.

Disability determinations for AT&T are made by Sedgwick Claims Management Services, Inc. ("Sedgwick"), the third-party claims administrator for the Plan. Sedgwick

2

manages the Integrated Disability Service Center for AT&T, and in doing so, determines whether employees who file benefits claims meet the Plan's definition of disability quoted above.  [R. 13 at 2; R. 13, Ex. A at 42-44, Ex. B at 8.]  In order to make this determination, once employees file their claims, Sedgwick conducts a Transferable Skills Analysis ("TSA") to determine first, whether the employee is capable of doing any work, and if so, whether there are alternative occupations the employee could perform that paid more than 50 percent of the employee's previous salary.  [R. 13 at 3, Ex. A at 22.]  If such occupations exist, then the employee does not meet the definition of long-term disability under the Plan.

In September, 2010, Chinn reported that he could no longer work due to severe arthritis, muscle spasms in his spine, pain in his right ankle, and decreased range of motion in his neck, lumbar spine, and right ankle.  [R. 14 at 2.]  Due to his condition, Chinn received the 26-week maximum short-term disability benefits package, and in December, 2010, Chinn applied for AT&T's long-term disability benefits.  [R. 13 at 3; AR at 71, 104-14.]

Once Chinn filed for LTD benefits, Sedgwick had to determine whether Chinn met the Plan's definition of disability.  When compiling Chinn's application materials, Case Manager Ontaria Reed entered information into her Claim Notes from a letter dated January 3, 2011, which she had received from Chinn's treating physician, Dr. John Patton.  [AR 12-13, 118.]  Ms. Reed entered Dr. Patton's letter word for word as follows:

> Mr. Chinn continues to suffer from back and ankle pain.  Sitting for 15-30 minutes causes pain upon getting up and his pain increases the longer he sits.  Standing and walking for 45-60 minutes causes discomfort in his back.  With alternating sitting, standing and walking he can last 3-4 hours with only some increase in pain.
>
> His permanent restrictions are listed below:
> No walking uphill more than 1 block, and no steep inclines
> No use of "climbers" and no use of ladders for more than 10 minutes
> No driving more than 3 hours

3

No carrying more than 25 pounds over terrain

He continues to be disabled due to osteoarthritis of the ankle, as well as back and neck pain.

[AR at 118, 12-13.]

On January 12, 2011, Ms. Reed referred Chinn's case for a TSA in order to determine if there were any occupations he was capable of performing. [AR 15-16.] When referring Chinn's case, Ms. Reed provided a "Summary of Medical" containing a nearly verbatim summary of Dr. Patton's letter, except for his comment about sitting for 15-30 minutes causing pain and his comment about Chinn being "disabled."[2] [AR 15-16.] Later that month, Vocational Rehab reviewer Priscilla Harris entered the TSA report into Chinn's file. [AR 18-19.] She included the same restrictions contained in Dr. Patton's letter that he had labeled as "permanent," as well as his diagnosis of osteoarthritis of the ankle, but she did not include Dr. Patton's specific comments about Chinn's back and ankle pain; his difficulty with prolonged sitting, standing or walking; or his comment about Chinn being "disabled." [AR 18-19, 121.] As part of her analysis, Harris determined that Chinn could perform three alternative occupations – repair order clerk, service order clerk, and motor vehicle dispatcher – all of which paid enough to disqualify him from receiving LTD benefits. [AR 20-21, 121-22.] Based on this determination, Sedgwick denied Chinn's claim via letter dated January 28, 2011.

After Chinn's short-term benefits expired, he returned to work while attempting to find alternative positions compatible with his physical limitations. [AR 29-30, 169.] In April, 2011,

---

[2] In Chinn's motion for judgment, Chinn claims that after referring Chinn's claim for a TSA, Reed improperly "re-entered her notes regarding" Dr. Patton's letter and omitted all of it except the part about permanent restrictions. [R. 14 at 3-4.] Upon a review of the record, however, the Court finds that Reed was responding to a request for clarification on Chinn's restrictions and whether they were permanent, and she accordingly quoted the part of Patton's letter labeled "permanent restrictions." [AR 17.] Without further facts, the Court sees nothing improper about this entry.

4

Chinn filed an appeal of his original denial and again left work, which Sedgwick treated as a Relapsed LTD Claim.  [AR 29-30, 34-35, 213.]  With his appeal, Chinn sent Sedgwick several pages of additional medical records from Dr. Patton and from Dr. Lisa DeGnore, an orthopedic surgeon who had examined Chinn in August, 2010.  [AR 165-177.]  Doctor Patton also forwarded another letter to Sedgwick dated April 5, 2011, which repeated almost exactly the same comments and the same restrictions contained in his January letter.  [AR 166.]

In response to Chinn's appeal, AT&T retained Dr. Jamie Lewis to conduct a review of Chinn's files.  After reviewing Chinn's case, Dr. Lewis concluded that the medical records did not identify a condition that would prevent Chinn from successfully completing a "job in a sedentary category [of] work nor does documentation support that performance of sedentary work place[s] the claimant at increasing risk of measurable harm or injury or measurable exacerbation of underlying musculoskeletal process."  [AR 218.]  According to Dr. Lewis, the documentation did not provide "objective data that would support the patient is unable to complete sedentary work.  As such, the claimant is not thought to be disabled from any occupation during the dates in question."  [AR 218.]  Doctor Lewis attempted to contact both of Chinn's treating physicians, Dr. Patton and Dr. DeGnore, by telephone but could not reach either of them.  [AR 43, 215, 216.]  Sedgwick then conducted a second TSA and again identified three occupations that would not conflict with the physical restrictions Dr. Patton had specified.  [AR 228-30.]  Accordingly, Sedgwick denied Chinn's first appeal, via letter dated May 12, 2011.  [AR 237-45.]

Chinn then filed a second appeal in October, 2011.  [AR 267-68.]  For purposes of processing Chinn's second appeal, Sedgwick referred his case for review to orthopedic surgeon Dr. Allan Brecher and to internist Dr. Neal Sherman.  Doctor Brecher attempted to speak with

Dr. Patton by telephone without success [AR 68], but he did speak with Chinn's orthopedic surgeon, Dr. DeGnore, who told Dr. Brecher that "from her notes there is nothing stopping this man from doing a sedentary job." [AR 290.] After reviewing Chinn's records and consulting with Dr. DeGnore, Brecher submitted his report in November, 2011, in which he concluded that "there is insufficient objective medical information" to support the conclusion that Chinn was unable to perform a sedentary job. [AR 292, 294.]

Doctor Sherman also reviewed Chinn's medical records and consulted with Dr. Patton, who was still acting as Chinn's primary care physician. [AR 44-48.] Doctor Sherman's report concluded that Chinn "could perform modified work activities as of 04/29/11 forward," [AR 47] and explained that Chinn had "sedentary work capacity" as long as he could have an accommodation for his need to "change position at will" and take five-minute breaks every two hours. [AR 46.] On December 12, 2011, after receiving the doctors' reports, Sedgwick denied Chinn's second appeal. [AR 296-98.] Mr. Chinn now has filed suit in this Court, requesting that the Court overturn the denial of his disability claim [R. 14], and AT&T has filed a motion for judgment requesting the Court to uphold the denial. [R. 13.]

## II
### A

Chinn argues that AT&T's decision denying him long-term disability benefits should be reversed. That decision, however, is entitled to a high degree of deference according to the standard by which the Court must adjudicate ERISA cases. The parties have agreed that the "arbitrary and capricious" standard of review applies because the policy grants discretionary authority to the Plan administrators to determine eligibility for disability benefits. [R. 13 at 9; R. 14 at 7.] *See University Hospital of Cleveland v. Emerson Electric*, 202 F. 3d 839, 845 (6th Cir. 2000) (explaining that courts review challenges to benefit determinations under the arbitrary and

capricious standard rather than the *de novo* standard when the plan "gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan") (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

      The arbitrary and capricious standard "is the least demanding form of judicial review of administrative action.  When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."  *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998) (citation omitted).  Courts applying this standard of review must uphold the plan administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of Am. Health and Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).  "Determining whether the plan administrator's decision was arbitrary and capricious means determining whether it was rational and in good faith, not right."  *Dials v. SCM Coal & Terminal Co*., 891 F. Supp. 373, 376 (E.D. Ky. 1995) (citing *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 39 (11th Cir. 1989)).  Thus, the question in any disability case with an "arbitrary and capricious" standard of review is whether the Plan "can offer a reasoned explanation," based on the evidence, for its judgment that a claimant was not "disabled" within the Plan's terms.  *Elliott v. Metro Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006).

### B

      For all intents and purposes, Chinn's challenge to AT&T's decision is a factual challenge.  Chinn essentially argues that AT&T did not conduct its review of his case properly, and now he requests this Court to weigh the evidence in the record differently and to reach a

different conclusion. Chinn presents four challenges to AT&T's decision.[3] First, Chinn argues that the TSAs were based on incomplete medical information because Case Manger Reed failed to present the correct information to Vocational Rehabilitation Counselor Harris. [R. 14 at 8.] Second, Chinn argues that AT&T's decision to have its physicians conduct file-only reviews instead of examining Chinn in person should cast doubt on the reliability of their conclusions. [R. 14 at 8-9.] Third, Chinn claims that AT&T was arbitrary in choosing to disregard Dr. Patton's opinion even though Dr. Patton was Chinn's treating physician and had examined him in person. [R. 14 at 9.] Finally, Chinn argues that because the same entity determines which claims are approved and also pays those claims, the Court should give less deference to AT&T's decision. [R. 14 at 10.] In light of the standard of review, however, as long as the administrative determination that Chinn could perform alternative occupations that paid more than 50% of his prior salary "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence," it will not be disturbed. *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006) (quoting *Baker*, 929 F.2d at 1144).

## 1

Chinn's fourth challenge involves a conflict of interest issue, but the Court will address this argument first in order to provide clarification on this point for the rest of the opinion. Chinn argues that the Court should exercise less deference in reviewing this case because AT&T was both the ultimate decision maker and the payer of benefits, thus creating a conflict of interest that should be considered in determining whether the denial of Chinn's claim was arbitrary and

---

[3] Chinn's Motion for Judgment [R. 14] originally listed five challenges, one of which asserted that the Court should consider the SSA's determination of whether Chinn was disabled [R. 14 at 8], but in the same document Chinn later stated that the SSA determination "is not a factor to be considered, as the determination was not made until after AT&T's final decision." [R. 14 at 10.] Accordingly, the Court will not consider it.

capricious.  [R. 14 at 10.]  AT&T responds to this challenge by asserting that Chinn has

misunderstood the relationship between Sedgwick and AT&T.  [R. 17 at 2.]  AT&T employee

John Adkins has explained in a declaration that Sedgwick is a third party claims administrator of

the Plan, and Sedgwick employees rather than AT&T employees review and decide all benefits

claims.  [*Id*. (quoting Adkins Decl., ¶ 4).]  According to Mr. Adkins, "no employees of any

AT&T company have any involvement in or input into" the benefit decisions made by Sedgwick.

*Id*.  Ms. Reed and Ms. Harris are Sedgwick employees, and the physicians retained to review

Chinn's case were retained by Sedgwick.  [R. 17 at 2-3.]  Although Sedgwick adjudicates the

benefits claims, Sedgwick does not pay the claims itself.  *Id*. at 3.  AT&T also explains that

Sedgwick operates the AT&T Integrated Disability Service Center, which is why the address was

listed as such in AT&T's initial discovery disclosures.  *Id*.

    When conflicts of interest exist, as Chinn alleges here, they "should be taken into account

as a factor in determining whether the . . . decision was arbitrary and capricious."  *University

Hospital of Cleveland*, 202 F. 3d at 846 (quoting *Davis v. Ky. Finance Companies Retirement

Plan*, 887 F.2d 689, 694 (6th Cir. 1989)).  The Supreme Court reaffirmed that administrators

acting in a dual capacity – as decision maker about benefits and payer of benefits – do have a

conflict of interest and that when such a conflict is present, "that conflict must be weighed as a

factor in determining whether there is an abuse of discretion."  *Metropolitan Life Ins. Co. v.

Glenn*, 554 U.S. 105, 105 (2008) (citation omitted).  Nonetheless, the weight a conflict is due

depends on the circumstances of each individual case, and its existence is certainly not enough to

change the review of the decision from deferential to *de novo*.  *Id*. at 106.  In order to diminish

the Court's deferential review, the plaintiff must demonstrate that "a significant conflict was

present," and the record must contain "significant evidence" that the plan administrator "was

9

motivated by self-interest." *Smith v. Continental Cas. Co.*, 450 F.3d 253, 260 (6th Cir. 2006) (finding that even when a conflict of interest existed because the same entity decided and paid claims, the conflict "was only a factor to consider" and did not alter the arbitrary and capricious standard of review).

Here, Chinn has not met his burden of showing that any conflict exists, let alone a significant conflict, nor has he demonstrated that either AT&T or Sedgwick were motivated by self-interest. *See Smith*, 450 F.3d at 260. AT&T has adequately explained the relationship between AT&T and Sedgwick, and because the record contains no evidence contradicting this explanation, nor has Chinn provided any evidence to the contrary, the Court does not find that any conflict of interest exists. If Sedgwick paid benefits out of its own assets, then there would be a "substantial" conflict of interest because its fiduciary role would conflict with its profit-making role as a business. *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991). According to AT&T, that is not the case here, and Chinn has alleged nothing that would lead the Court to believe otherwise. The cases Chinn cites in support of his contention apply to situations in which the plan administrator who determines whether claimants are disabled is also the insurer that ultimately pays the benefits. *See e.g., Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 527, 527-28 (6th Cir. 2003). Such is not the case here. A more analogous situation is in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (1965), where the Court found no conflict of interest when Black & Decker Corporation funded the benefits plan at issue, but had delegated authority to review and give recommendations on benefits claims to a third-party, MetLife. 538 U.S. at 825-26. Thus, as here, the entity that paid the benefits was separate from the entity that

10

reviewed the claims, and no conflict was found.[4]  *Id.*

**2**

Second, Chinn objects to Sedgwick's determination that he could perform some sedentary work because he believes that both TSAs were based on incomplete medical information.  [R. 14 at 4, 8.]  Chinn contends that this information was incomplete because his case manager Ms. Reed "willfully manipulated his medical information to achieve a pre-determined result," thus violating ERISA regulations requiring a "full and fair" review of disability claims.  [R. 14 at 8.]  AT&T responds to this accusation by explaining that Reed was required to provide summaries of Chinn's medical condition to Harris, and that although the summaries she provided did not quote Dr. Patton's letter verbatim, they were much closer to what Dr. Patton wrote than Chinn has suggested.  [R. 17 at 4.]

Chinn accuses Reed of presenting "only favorable medical opinions" to Harris and of "omit[ing] restrictions and other medical information that tended to support Chinn's LTD claim." [R. 14 at 8.]  Chinn, however, provides nothing further to support this accusation.  The Court must consider the evidence contained in the record, and the record reflects that Reed did not provide Harris with any "favorable" medical opinions at all, nor does her alleged omission support an accusation of willful manipulation.  Fundamentally, Chinn appears to misunderstand Ms. Harris' role in this process.  Reed's purpose of providing summaries of medical information to Harris was to help her analyze what work Chinn was physically capable of performing so that Harris could perform the TSA and identify any jobs Chinn was able to do.  [*See* AR 18 (stating that the TSA "will address the possibility of identifying occupations that can be performed

---

[4] In light of this situation, the Court will refer to Sedgwick when discussing the entity that reviewed and adjudicated Chinn's disability claim, even though Chinn refers almost exclusively to AT&T in his arguments.

within the medical restrictions and limitations and capabilities provided").]  As far as can be determined from the record, the only medical opinion that Reed could pass on to Harris for the first TSA was the information contained in the letter from Dr. Patton dated January 3, 2011. That letter, as quoted above, listed Chinn's "permanent restrictions" and made several comments about other limitations on sitting and walking related to Chinn's back and ankle pain.  [AR 118.] Chinn is correct that the first TSA Harris performed did not mention pain and discomfort caused by standing, sitting, or walking for certain amounts of time.  [*See* AR at 121-22.]  However, Harris did include nearly verbatim the portion of Dr. Patton's letter which listed "permanent restrictions," and she also described Chinn's problems of "severe arthritis, lumbar spine spasms, tender right ankle and decreased range of motion in the neck, lumbar spine, and right ankle," as well as "osteoarthritis of the ankle."  [*Compare* AR 19, 121 *with* AR 118.]  Dr. Patton's letter did not include anything about sitting in the list of "permanent restrictions," and it was not per se irrational for Ms. Harris to only include the "permanent restrictions" in her report when her main purpose was to identify Chinn's physical limitations in working.

Regardless, even if Reed and Harris should have included the portion of Dr. Patton's letter referencing Chinn's pain, the second TSA did note Chinn's back and neck pain, and his need to change position frequently because of it.  [*See* AR 54, 228, 233.]  While not quoting Dr. Patton's entire letter, the second TSA again the listed restrictions and appears to have considered Chinn's pain when formulating the accommodations that he would need and the type of work he could do.  [*Compare* AR 118 *with* AR 54, 228, 233.][5]  Moreover, the conclusions stated in the

---

[5] The omitted portion of Dr. Patton's letter stated that Chinn could last 3-4 hours with "alternating sitting, standing and walking," that "sitting for 15-30 minutes caused pain upon getting up," and that standing and walking for 45-60 minutes "causes discomfort in his back."  [AR 118.]  The second TSA specified that Chinn needed "the opportunity to change position at will as well as additional five minute rest breaks every two hours."  [AR 54, 228, 233.]  It also

second TSA were in line with Dr. Sherman's conclusions, whose records were also part of what Ms. Harris had to consider.  [AR 47-48.]

The primary issue in an ERISA case "is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc*., 313 F.3d 356, 261 (6th Cir. 2002).  As previously explained, the purpose of conducting a TSA was not simply to quote doctors' reports, but to evaluate medical evidence and make recommendations about claimants' work capacity.  Ms. Harris clearly took into account the information available, and the Court cannot require the decision-makers in this process to come to a certain conclusion – they only need to support the conclusion with substantial evidence.  *Killian*, 152 F.3d at 520.

**3**

Third, Chinn seeks to discredit the reports of Dr. Sherman, Dr. Lewis, and Dr. Brecher by suggesting that because they did not examine Chinn in person their opinions deserve less weight. [R. 14 at 9.]  Although Chinn admits that the Plan grants AT&T discretion to conduct reviews based only on the record rather than in-person examinations, Chinn still contends that Sedgwick's choice to do so should "raise questions" about the accuracy of its conclusions, because, according to Chinn, "[n]o physician can assess the severity of a patient's pain from documents."  [*Id*. at 9.]  AT&T, however, argues that Sedgwick did conduct more than a mere record review because Dr. Sherman and Dr. Lewis both consulted with doctors who had actually examined Chinn.  [R. 17 at 6-7.]  Moreover, even if Sedgwick had conducted a file-only review, doing so is not automatically considered irrational.  [R. 17 at 5-6.]

---

stated that Chinn could do sedentary work if he had an accommodation for changing position "at will" and taking frequent 5-minute breaks. *Id*.  Such language appears to have at least considered Dr. Patton's concerns.

Both parties reference *Smith v. Continental Cas. Co.*, 450 F.3d 253 (6th Cir. 2006), in support for their arguments on this issue. The Court in *Smith* determined that the claimant was not given a "full and fair" review of a disability claim because the physician who conducted a file-only review rather than a physical examination also made credibility determinations about the claimant's subjective complaints concerning pain. *Smith*, 450 F.3d at 263-64. The Court noted that there is nothing "inherently objectionable about a file review by a qualified physician in the context of a benefits determination," 450 F.3d at 263 (quoting *Calvert* at 296), but that in Smith's case, "[p]ain is a subjective complaint" that is often disproportionate to a doctor's findings based only on a record. *Id.*

The Court finds Chinn's case distinguishable from *Smith*, however, because in *Smith* the claims administrator failed to consult with the treating physician and made a credibility determination about the claimant's own reports of pain apart from a physical examination. *Id.* at 262, 263. In Chinn's case, he had several physical examinations, and Sedgwick's doctors consulted with the doctors who performed those examinations. Doctor Sherman consulted with Chinn's treating physician, Dr. Patton, and reviewed Dr. Patton's notes and records. [AR 44-45, 47.] Additionally, Dr. Brecher consulted with Dr. DeGnore, who had examined Chinn's ankle at the request of Dr. Patton, and Dr. DeGnore specifically told Dr. Brecher that, based on her notes of Chinn's exam, "there is nothing stopping this man from doing a sedentary job."[6] [AR 290.] Moreover, although pain is often subjective, *see* 450 F.3d at 263, none of Sedgwick's doctors ignored reports of Chinn's pain; rather, they focused on his ability to perform work. For example, Dr. Lewis' conclusion acknowledged Chinn's pain but noted that the records from Dr.

---

[6] Although Chinn takes issue with the fact that Dr. DeGnore's statement was based on her notes, the Court sees nothing that would require Dr. Brecher to have personally examined Chinn or that would prevent Dr. Brecher from relying on what Dr. DeGnore told him about her own conclusions.

Patton's examination did not show "any functional loss of range of motion," nor did it demonstrate any "focal neurologic deficits in strength or dexterity." [AR 218.] Furthermore, neither of the TSAs ignored the fact that Chinn suffered pain, and both TSAs confirmed his need for certain accommodations, which were presumably needed because of his pain. As will be discussed further below, the fact that Sedgwick's doctors did not form exactly the same conclusions as Dr. Patton is not a sufficient basis for this Court to overturn the decision. *See Black & Decker*, 538 U.S. at 831.

**4**

Chinn's final argument is that AT&T improperly gave the opinion of his treating physician, Dr. Patton, less weight than Sedgwick's physicians who only conducted record reviews. [R. 14 at 9.] According to Chinn, Sedgwick "arbitrarily disregarded" Dr. Patton's opinions "almost entirely," thus refusing to consider reliable evidence. [*Id*. (citing *Black & Decker*, 538 U.S. at 833).] The basis for Chinn's contention on this point appears to be that Sedgwick did not give enough weight to Dr. Patton's analysis of his condition, particularly because Chinn believes Dr. Patton's comments about his pain contradict the TSA assessment that he can perform certain sedentary occupations. Chinn also objects to the fact that Sedgwick did not adopt Dr. Patton's diagnosis of April, 2011 concerning Chinn's osteoarthritis and degenerative disc disease. [R. 16 at 2.] According to AT&T, however, just because Sedgwick did not adopt Dr. Patton's exact opinion on every point does not mean that his opinions were ignored. [R. 17 at 8.]

Under ERISA, Plan administrators have no duty to accord special deference to the opinions of treating physicians. *Black & Decker*, 538 U.S. at 832-34. Unlike the mandatory deference given to treating physicians in Social Security cases, in the ERISA context the

Supreme Court has held that courts cannot require plan administrators "'automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.'" *Evans v. UnumProvident Corp.,* 434 F.3d 866, 877 (6th Cir. 2006) (quoting *Black & Decker*, 538 U.S. at 834). Nevertheless, it is also true that a plan administrator may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," *id*. at 834, nor may plan administrators "reject summarily the opinions of a treating physician." *Elliott v. Metro Life Ins. Co*., 473 F.3d 613, 620 (6th Cir. 2006).

Here, the record does not reflect that Sedgwick summarily rejected Dr. Patton's opinions. Sedgwick simply characterized Chinn's problems differently. As discussed above, Dr. Patton's records formed a large part of the evidence Sedgwick reviewed when conducting both TSAs. Sedgwick's physicians spoke with Dr. Patton [AR 45], reviewed his records, and used his comments when formulating the list of Chinn's physical limitations. [AR 45-46.] The first TSA listed Chinn's restrictions almost verbatim from the list Dr. Patton gave. [AR 121.] While Sedgwick did not adopt Dr. Patton's comment that Chinn was "disabled,"[7] Sedgwick was required to determine the question of Chinn's disability according to a very specific definition of "disabled" as prescribed by the Plan, and nothing indicates that Dr. Patton was referencing the Plan's definition of disabled when he used that word to describe Chinn. Thus, it was not irrational for Sedgwick to omit Dr. Patton's conclusion that Chinn was disabled.

The Supreme Court has explained that the "validity of a claim to benefits under an

---

[7] Doctor Patton's letter of January 3, 2011, said that Chinn "continues to be disabled due to osteoarthritis of the ankle, as well as back and neck pain." [AR 118.]

ERISA plan, . . . is likely to turn . . . on the interpretation of terms in the plan at issue." *Black & Decker*, 538 U.S. at 833 (quoting *Firestone Tire*, 489 U.S. at 115). Employers have great discretion in crafting their benefits plans and in defining the terms of such plans. *Id*. at 833 (explaining that the Secretary of Labor has decided that ERISA "is best served by preserving the greatest flexibility possible for . . . operating claims processing systems consistent with the prudent administration of a plan.") (internal quotations and citations omitted). Therefore, AT&T's decision to deny Chinn's claim should be upheld if it is found "rational in light of the plan's provisions." *Spangler*, 313 F.3d at 261 (citations and internal quotation marks omitted).

    Here, the Plan's definition of disability was intricately connected to what kind of work a person was capable of doing. Doctor Patton did not opine as to what jobs Chinn could perform, but merely stated what his physical condition and limitations were. Doctor Lewis opined that the medical records did not preclude Chinn performing a sedentary occupation. [AR 218.] Doctor Brecher and Dr. Sherman reported that, based on reviewing Chinn's records and speaking with doctors who had personally examined him, they believed Chinn could perform a sedentary job with certain restrictions. [AR 47, 294.] Based on these reports, Ms. Harris then identified certain sedentary jobs Chinn could perform. There is no evidence that any doctor's report was completely or arbitrarily disregarded. Two doctors agreed Chinn could perform sedentary work, while Dr. Patton never said Chinn could not do sedentary work; he simply listed Chinn's physical restrictions. There is nothing in the record to suggest that Sedgwick's administrators used unreliable evidence or acted irrationally by relying on the reports of several doctors who did not contradict each other just because those reports were not exactly the same as Dr. Patton's original letter. *See Black & Decker*, 538 U.S. at 834.

    In conclusion, nothing in ERISA "suggests that plan administrators must accord special

deference to the opinions of treating physicians." *Black and Decker,* 538 U.S. at 831.  Nor does

ERISA "impose a heightened burden of explanation on administrators when they reject a treating

physician's opinion." *Id*.  Thus, the mere fact that Dr. Patton had examined Chinn several times

does not mean that his opinion was entitled to greater weight than that of Dr. Sherman or Dr.

Lewis.[8]  Moreover, Dr. Sherman spoke to Dr. Patton and formulated his opinion partly from Dr.

Patton's records, and Dr. Brecher consulted with Dr. DeGnore, who had also examined Chinn.

Under the arbitrary and capricious standard of review, the Court will not re-evaluate the medical

evidence --- rather, this Court must merely determine whether Sedgwick's reliance on the

combined opinions of Dr. Sherman, Dr. Lewis, and Dr. Brecher, as well as Dr. Patton, was

"rational and in good faith, not right." *Dials v. SMC Coal & Terminal Co*., 891 F. Supp. 373,

376 (E.D. Ky. 1995).  The record does not reflect that Dr. Patton's opinions were summarily

dismissed or wrongly ignored, and thus Sedgwick had a rational basis for its conclusion as to

Chinn's physical condition and abilities.

### III

For the foregoing reasons, it is hereby ordered as follows:

(1)     Plaintiff's Motion to Reverse the Decision of Claims Administrator, which the

Court construes as a Motion for Judgment Overturning the Administrative Decision [R. 14] is

**DENIED**;

(2)     Plaintiff's Complaint is **DISMISSED** with prejudice;

---

[8] The case Chinn cites as support for his contention is not applicable to this case for several reasons.  [R. 14 at 9 (citing *Napier v. Hartford Life Ins. Co*., 282 F. Supp. 2d 531 (E.D. Ky. 2003).]  Unlike the case at hand, the court in *Napier* used a *de novo* standard of review because the disability plan at issue did not include a grant of discretion sufficient to warrant use of the arbitrary and capricious standard.  *Napier*, 282 F.Supp.2d at 534.  Moreover, the court in Napier also found that the benefits determination was based on "inconsistent and incomplete findings" due to its having completely ignored the opinions of the claimant's treating physicians.  *Id*. at 537-538.  As explained above, such is not the situation with Chinn's case.

(3)     Defendant's Motion for Judgment [R. 13] is **GRANTED**; and

(4)     Pursuant to Federal Rule of Civil Procedure 58(a), the clerk is **DIRECTED** to enter the judgment filed contemporaneously herewith.

This 30th day of September, 2013.

**Signed By:**

*__Gregory F. Van Tatenhove__*

**United States District Judge**